# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DWAYNE DUMONT HAIZLIP,      )
                            )
            Plaintiff,      )
                            )
      v.                    )           1:14CV770
                            )
RICK ALSTON, et al.,        )
                            )
            Defendants.     )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on the Motion for Summary Judgment (the "Summary Judgment Motion") of Defendants Moore ("Defendant Moore"), Hannon ("Defendant Hannon"), Caviness ("Defendant Caviness," and collectively with Defendant Moore and Defendant Hannon, the "Search Defendants"), and Alston ("Defendant Alston," and collectively with the Search Defendants, the "Defendants"). (Docket Entry 51.) For the reasons that follow, the undersigned will recommend that the Court grant in part and deny in part the Summary Judgment Motion.

## I. PROCEDURAL HISTORY

Plaintiff, an inmate proceeding pro se, filed an initial complaint (the "Complaint") alleging claims of excessive force and presenting false testimony (Docket Entry 2) under 42 U.S.C. § 1983. The Court dismissed Plaintiff's false-testimony claim, but allowed

his excessive force claim to proceed. (Docket Entry 8.) After Defendants filed a Motion to Dismiss (Docket Entry 24), Plaintiff filed a Motion for Leave to File an Amended Complaint (Docket Entry 28), which the Court granted (Docket Entry 30). Plaintiff's sworn, amended complaint (the "Amended Complaint") re-asserts Plaintiff's excessive force claim against Defendants and alleges that the events giving rise to that claim all occurred on September 8, 2011 (Docket Entry 28 at 2-3), rather than on September 7, 2011, as alleged in the Complaint (Docket Entry 2 at 3).

The parties then engaged in discovery. (See, e.g., Docket Entry dated July 13, 2015.) At the end of discovery, Defendants filed the Summary Judgment Motion, arguing that (1) "the applicable three-year statute of limitations" bars Plaintiff's excessive force claim against the Search Defendants, and that (2) "Defendants are entitled to qualified immunity from suit in this case." (Docket Entry 51 at 1-2.) Along with the Summary Judgment Motion, Defendants filed (1) a supporting brief (Docket Entry 52), (2) Defendants' declarations (Docket Entries 53, 54, 55, 56), (3) an Incident/Investigation Report (Docket Entry 56-1), (4) the Declaration of Kerry Cross (Docket Entry 57), (5) the Declaration of Kimberly Gross (Docket Entry 58), and (6) certain documents regarding the towing of a vehicle (Docket Entry 58-1). The Clerk sent Plaintiff a letter in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the

-2-

requirements for filing a response to the Summary Judgment Motion. (Docket Entry 59.) Despite that notice, Plaintiff failed to respond to the Summary Judgment Motion. (See Docket Entries dated Feb. 15, 2016, to present.)

## II. STATEMENT OF FACTS

This action arises from Defendants' alleged use of excessive force against Plaintiff. (See Docket Entry 28 at 2-3.) As detailed below through their sworn statements, the parties present different versions of the relevant events.

### A. Plaintiff's Version

Plaintiff's version of the relevant events begins on the evening of his arrest. In particular, Plaintiff asserts that:

"[T]here was a crash, chase and arrest" involving certain officers, Plaintiff, and Pamela Haizlip ("Ms. Haizlip"). (Id. at 2.)[1] After the officers "apprehended, handcuffed and arrested" Plaintiff, they "told [him] to stand up because he was on the ground." (Id.) The officers then searched Plaintiff and "told [him] to sit back down." (Id.) "[A]s [Plaintiff] was attempting to sit down[,] [Defendant] Caviness kicked the Plaintiff in the right side of his leg in attemps [sic] to injure him, during the same time [that] [Defendant] Hannon and [Defendant] Moore pull[ed] and drag[ged] the [P]laintiff to and on the ground (concrete)

_____

[1] Ms. Haizlip is Plaintiff's aunt. (Docket Entry 56, ¶¶ 8, 23.)

-3-

causing abrasions on both [Plaintiff's] right[ and] left elbow areas and left forearm[]." (Id. at 2-3.)

After transporting Plaintiff to jail, "bail was given to the Plaintiff and [Ms. Haizlip]." (Id. at 3.) Defendant "Alston grab[bed] the Plaintiff and t[ook] him to the concrete floor roughly and handcuff[ed] him behind his back." (Id.) "[Defendant] Alston attemps [sic] to pick up the Plaintiff by the handcuffs," but "drop[ped] the Plaintiff back to the concrete floor with the handcuffs on behind his back in attemps [sic] to further injure him." (Id.) "[Defendant] Moore c[ame] to assist [Defendant] Alston with picking up the Plaintiff from the floor" and "open[ed] the holding cell." (Id.) "[Defendant] Alston then grab[bed] the Plaintiff an[d] thr[ew] him into the holding cell roughly with the handcuffs still on, into the wall further injuring [Plaintiff's] already wrap [sic] arms [from] the abrasion injuries." (Id.)

## B. Defendants' Version

At all times material to this action, Defendants served as police officers with the Greensboro Police Department (the "GPD"). (Docket Entry 53, ¶ 2; Docket Entry 54, ¶ 2; Docket Entry 55, ¶ 2; Docket Entry 56, ¶ 2.) Defendants have provided a more detailed version of the events surrounding Plaintiff's apprehension, arrest, and booking.

-4-

**i. Defendant Alston**

Defendant Alston reports that:

He learned through a confidential informant that drug purchases occurred at a particular residence. (Docket Entry 56, ¶ 5.) While conducting surveillance at that residence, Defendant Alston observed Plaintiff attempt to approach his vehicle, and later observed an SUV owned by Ms. Haizlip (the "SUV") leave the residence. (Id. ¶¶ 7-8.) Upon leaving the residence, "[t]he SUV . . . travelled at a high rate of speed, violating multiple traffic laws." (Id. ¶ 9.) Other officers commented on "an open radio communications channel . . . that if it was Ms. Haizlip, she would run." (Id. ¶ 10.) A "vehicle chase" involving the SUV and officers other than Defendant Alston "ensued." (Id. ¶ 11.)

After officers stopped the SUV, Defendant Alston arrived on the scene and observed "Plaintiff hopping a fence . . . and [Defendant] Moore in pursuit of him." (Id. ¶ 12.) Defendant Alston drove "around the perimeter to get in a position to help" (id. ¶ 13), and heard through the radio that officers had apprehended Plaintiff and found drugs (id. ¶ 14). Defendant Alston "remained at the scene during the time that [he] and the other officers processed the crime scene, collected the drug evidence[,] and moved the Plaintiff to a marked vehicle for transport to the [jail]." (Id. ¶ 15.) "During this time at the scene, [Defendant Alston reports that he] observed all the activities related to the

-5-

custody of the Plaintiff, and no act of excessive force against the Plaintiff occurred at any point."  (Id. ¶ 16.)

Upon arrival at the jail, Defendant Alston observed that Plaintiff and Ms. Haizlip initially presented "no real problems." (Id. ¶ 19.)  However, after a magistrate read them their charges and set their bonds, they "became aggravated" (id. ¶ 20) and "visibly angry towards [Defendant] Moore and [Defendant Alston]" (id. ¶ 21).  "During this time[,] neither the Plaintiff nor Ms. Haizlip were handcuffed."  (Id. ¶ 22.)

"[Defendant Alston] told Ms. Haizlip to give [him] her property for processing per standard procedure."  (Id. ¶ 23.) Plaintiff responded, "'you're not going to be talking to my aunt like that' in an aggressive tone as he approached [Defendant Alston]."  (Id.)  "Plaintiff proceeded to approach [Defendant Alston] in a fighting manner" (id. ¶ 24), and "[u]ltimately . . . squared his body to [Defendant Alston] and took an aggressive, fighting stance" (id. ¶ 25).  "[Defendant Alston] attempted to escort [Plaintiff] back to the bench where he had been sitting, but [Plaintiff] went back into the corner, remained in an aggressive stance, and . . . clench[ed] his fists."  (Id. ¶ 26.)  Plaintiff also called Defendant Alston "multiple racist names."  (Id. ¶ 27.)

"Ms. Haizlip then attempted to get involved, but [Defendant] Moore took physical control of her and ensured that she remained on the bench."  (Id. ¶ 28.)  "[Defendant Alston] continued to try [to]

-6-

gain control of the Plaintiff and the Plaintiff continued to take a stance as if [he] wanted to physically fight." (Id. ¶ 29.) Although Ms. Haizlip was now handcuffed, she "still attempt[ed] to get involved." (Id. ¶ 30.)

"[Defendant Alston] finally was able to bring the Plaintiff to the ground in normal fashion and place him in handcuffs." (Id. ¶ 31.) Defendant Alston then picked Plaintiff up and took him to a holding cell. (Id. ¶ 32.) Defendant Moore assisted with opening the holding cell door. (Id. ¶ 33.) Because "Plaintiff continued to physically resist being moved," Defendant Alston "grapple[d] the Plaintiff face-to-face and put him into the holding cell." (Id. ¶ 34.) "[Defendant] Moore quickly closed the door to prevent the Plaintiff from attempting to charge back out." (Id. ¶ 35.) "Plaintiff immediately spit in [Defendant Alston's] direction close to [him]." (Id. ¶ 36.) Defendant Alston asserts that "[a]t no point did [he] propel the Plaintiff with force which caused the Plaintiff to fall, hit a wall or come into contact with any other objects." (Id. ¶ 34.) Additionally, Defendant Alston asserts that Plaintiff did not "request . . . EMS or medical attention," and that "there were no bandages on anyone involved." (Id. ¶¶ 37-38.)

### ii. Defendant Moore

Defendant Moore's version of the relevant events begins with the officers' pursuit of the SUV. Defendant Moore reports that:

-7-

Defendant Alston called him "to assist in an investigation arising from a residential narcotics complaint." (Docket Entry 53, ¶ 6.) Defendant Alston dictated "through a working channel that a [vehicle] was heading towards U.S. 29." (Id. ¶ 7.) Defendant Moore followed "a number of surveillance vehicles and not directly behind the suspect's [vehicle]." (Id. ¶ 8.) "On the working channel, one of the officers ran the license plate number on the [vehicle] and discovered that it belonged to [Ms.] Haizlip, who had a suspended license." (Id. ¶ 9.) "Statements were also made regarding the tendency of anyone in the Haizlip family to run from police." (Id. ¶ 10.) Another officer attempted to initiate a traffic stop of the vehicle, but it "accelerated and attempted to elude police." (Id. ¶¶ 11-12.) "A vehicle pursuit ensued between officers and the [vehicle] when [it] failed to heed blue lights and siren." (Id. ¶ 13.) Defendant Moore "observed [the pursuing officer] attempting to stop the [vehicle] and the vehicles exiting at [an] exit ramp." (Id. ¶ 14.) "[Defendant Moore] simultaneously observed a subject who [he] later identified as [Plaintiff] running up the exit ramp from the officers." (Id. ¶ 15.)

"[Defendant Moore] initiated a foot pursuit for resisting a public officer and suspicion of narcotics[,] and issued verbal commands like 'stop, police[,]' 'you're under arrest[,]' and 'get down.'" (Id. ¶ 16.) Plaintiff did not comply with Defendant Moore's commands, but "proceeded to run up the ramp, and jump over

-8-

a three-foot fence." (Id. ¶ 17.) Defendant Moore "chas[ed] the Plaintiff and yell[ed] verbal commands to 'stop, police[,]' 'you're under arrest[,]' and 'get down[.]'" (Id. ¶ 18.)

At one point during the foot pursuit, Plaintiff "ran straight into a dense hedgerow of bushes" (id. ¶ 19) and "crouched down" (id. ¶ 27) "in the fetal position with his back to [Defendant Moore]" (id. ¶ 20). "[Defendant Moore] could tell [Plaintiff] was doing something with his hands but could not tell what it was." (Id.) Defendant Moore yelled more commands, "to which the Plaintiff did not adhere." (Id.) "The Plaintiff then came to his feet and ran away from [Defendant Moore] again." (Id. ¶ 21.) Defendant Hannon arrived on the scene, and Defendant Moore "chased the Plaintiff through the brush." (Id. ¶ 21.) "[Defendant Moore] continued to follow the Plaintiff on foot, while continuously yelling commands." (Id. ¶ 22.)

When Defendant Moore finally caught up with Plaintiff, "[he] tackled [Plaintiff] to the ground," and "placed handcuffs on him and told him he was under arrest." (Id.) "During this time the Plaintiff was passively resisting by not listening to [Defendant Moore's] commands and directions." (Id. ¶ 23.) "[Defendant Moore] had many abrasions on [his] arms and legs resulting from the chase." (Id. ¶ 24.)

"As [Defendant Moore] was detaining the Plaintiff, [Defendant] Caviness was coming on to the scene by vehicle." (Id. ¶ 25.)

-9-

"[Defendant Moore] did not observe any force applied by . . . [Defendant] Caviness." (Id. ¶ 26.) Defendant Moore "then radioed for more officers, as well as a K9 Unit to check out the area where the Plaintiff was crouched down to see if the Plaintiff had discarded contraband." (Id. ¶ 27.) That search revealed "a Crown Royal bag with a trafficking amount of cocaine buried loosely in the dirt area where [Defendant Moore] [had] observed the Plaintiff laying down in the fetal position." (Id. ¶ 28.) Because tactical medic Kerry Cross ("Medic Cross") "was already on the scene," Defendant Moore requested that Medic Cross evaluate Plaintiff. (Id. ¶ 31.)[2] Defendant Moore reports that "[i]t is typical for those who resist and flee to fain injury as a means to further delay and prolong the process of transfer to the jail." (Id.) Officers then transported Plaintiff and Ms. Haizlip to the jail. (Id. ¶ 32.)[3]

At the jail, Defendant Moore assisted with processing Plaintiff and Ms. Haizlip. (Id. ¶ 33.) During processing, "Plaintiff and Ms. Haizlip were hard to deal with," and "talk[ed]

---

[2] Medic Cross asserts that "[w]hen [he] first arrived on scene [he] . . . found [Plaintiff] in custody sitting on the curb" and "alert." (Docket Entry 57, ¶ 7.) Medic Cross further asserts that he "then attempted to examine the Plaintiff," but that "Plaintiff refused treatment." (Id. ¶¶ 8-9.)

[3] Defendant Moore provides no other details regarding the alleged search of Plaintiff. (See Docket Entry 53.)

over [Defendant] Alston and [Defendant Moore]." (Id. ¶ 34.) In

that regard, Defendant Moore asserts:

> The standard booking procedure when arriving at the jail
> is to have the person in custody sit on a bench and have
> them handcuffed to a rail. For the magistrate hearing
> where bond will be set, the person is taken off of the
> rail and into a room where two magistrates are. This
> protocol was followed . . . with the Plaintiff and Ms.
> Haizlip. During the magistrate hearing neither the
> Plaintiff nor Ms. Haizlip were in handcuffs. At this
> point[,] both had calmed down, however once their bond
> was set, both became agitated and riled up. At one point
> after bond had been set, [Defendant] Alston and Ms.
> Haizlip were in a heated discussion. The Plaintiff
> appeared to take offense to this, and began challenging
> [Defendant] Alston. The Plaintiff called [Defendant]
> Alston derogatory names, was clenching his fists, and was
> standing him up in an aggressive fighting stance. These
> were all signs of a pre-assault, meaning a person is
> either going to run or assault. During this time[,] the
> Plaintiff was not handcuffed. [Defendant] Alston
> proceeded to take the Plaintiff to the ground as standard
> procedure dictates. During this time I told Ms. Haizlip
> to sit down because she was trying to get involved in the
> situation between [Defendant] Alston and the Plaintiff.
> I proceeded to handcuff Ms. Haizlip back to the rail.
> After doing this, I went over to [Defendant] Alston to
> assist him in picking up [Plaintiff]. [Defendant] Alston
> and I walked the Plaintiff over to a cell. I opened the
> cell door and [Defendant] Alston pushed the Plaintiff
> into the cell. When the Plaintiff was pushed into the
> cell, he never came in contact with any fixed objects,
> nor did he fall to the ground. The Plaintiff spat on
> [Defendant] Alston and then I closed the door.

(Id. ¶¶ 35-51 (paragraph numbering and line spacing omitted).)

Defendant Moore further denies "observ[ing] any signs of injury" to

Plaintiff. (Id. ¶ 55.)

-11-

### iii. Defendant Caviness

Defendant Caviness's version of the relevant events picks up when Defendant Alston reported suspicious vehicle activity. Defendant Caviness reports that:

"[Defendant] Alston called in suspicious vehicle activity," and "identified the vehicle over the radio." (Docket Entry 54, ¶ 4.) "[Defendant Caviness] saw the vehicle [Defendant] Alston was radioing about" (id. ¶ 5), and "[she] proceeded to follow the vehicle, along with other officers" (id. ¶ 6). "[Defendant Caviness] was able to see when [another officer] turned his lights on, and [she] could hear the details of the pursuit via radio," but "[she] was unable to see the wreck that occurred at the . . . [e]xit." (Id. ¶ 7.) "As [she] was coming upon the wreck, [Defendant Caviness] saw the Plaintiff running over to a fence away from officers." (Id. ¶ 8.) "[Defendant Caviness] proceeded to go off the road and loop around . . . in an attempt to set up a perimeter." (Id. ¶ 9.) "Officers had walked the Plaintiff from the wooded area . . . and sat him down on the curb when [Defendant Caviness] arrived." (Id. ¶ 10.)

Defendant Caviness questioned Plaintiff, but he "ignored [her] questions and . . . curs[ed] and sp[oke] in a rude manner towards [her] and other officers." (Id. ¶ 11.) "Officers lifted the Plaintiff off the curb to search him. Plaintiff became visibly agitated and was still mouthing off to the officers while they

-12-

searched him." (Id. ¶ 13.) "While officers were attempting to sit the Plaintiff back down, Plaintiff . . . stiffen[ed] his body and [took] steps backward to avoid sitting." (Id. ¶ 14.) However, "[i]t was crucial for the Plaintiff to remain seated due to his history of flight, and the fact that being handcuffed would not hinder his ability to engage in another foot pursuit." (Id.) "Due to Plaintiff's resisting, . . . officers [had] difficulty getting the Plaintiff to sit down, so [Defendant Caviness] stuck [her] foot out to prevent [Plaintiff] from stiffening his body and [to] allow the officers to lower him to the ground." (Id. ¶ 15.) "[Defendant Caviness] did not kick [Plaintiff] or attempt to kick [Plaintiff] in any way." (Id.) "During this entire time, the Plaintiff was uncooperative, belligerent, angry, and consistently physically resisting." (Id. ¶ 16.) "[Defendant Caviness] do[es] not recall the Plaintiff having any bruises or bleeding," and she "did not see any officers drag the Plaintiff on the ground." (Id. ¶¶ 18-19.)

### iv. Defendant Hannon

Defendant Hannon's version of the relevant events begins when he heard through the radio of the officers' involvement in a chase. Defendant Hannon reports that:

"[He] was on patrol when [he] heard over the radio that the narcotics unit was in a chase, approaching [an] . . . exit." (Docket Entry 55, ¶ 5.) "[Defendant Hannon] was in the area so [he] made the decision to assist [his] fellow officers." (Id.

-13-

¶ 6.) "When [he] arrived on scene, [he] observed the Plaintiff fleeing up the . . . exit ramp from the vehicle." (Id. ¶ 7.) "[Defendant Hannon] also observed [Ms. Haizlip] handcuffed at the bottom of the ramp." (Id.) "[Defendant Hannon] then observed the Plaintiff running . . . towards [a] fence," "scale the fence," and "bury something in a bush filled area." (Id. ¶¶ 8-9.) "During the entire chase[, Defendant Hannon] was able to hear officers yelling at the Plaintiff." (Id. ¶ 11.)

"When [Defendant Hannon] arrived where the Plaintiff was being held, [Plaintiff] was in handcuffs and sitting on the sidewalk." (Id. ¶ 13.) Defendant Hannon did not assist in Plaintiff's actual arrest, touch Plaintiff at this time, or drag Plaintiff across any ground. (Id. ¶ 14.) Instead, Defendant Hannon "was . . . told to stand by." (Id.)

While sitting on the sidewalk, Plaintiff "became agitated," "[ran] his mouth," "curse[d]," and "urinate[d] in his pants." (Id. ¶ 15.) Defendant Hannon "assisted the Plaintiff off of the curb by picking him up by one arm so that he would go from sitting to standing," and "then searched the Plaintiff per normal procedure." (Id. ¶¶ 17-18.) Defendant Hannon then placed Plaintiff in his vehicle on a "foil and cardboard seat" and "transported the Plaintiff to [jail]." (Id. ¶¶ 19-20.) "During the entire drive[,] the Plaintiff was running his mouth." (Id. ¶ 20.) "Once [Defendant Hannon and Plaintiff] arrived at the jail, [Defendant

-14-

Hannon] got the Plaintiff out of the vehicle, walked him into the jail, un-cuffed one [of Plaintiff's] hand[s] and cuffed him to something in the jail per protocol."  (Id. ¶ 21.)

### III. ANALYSIS

#### A. Summary Judgment Standard

The Court should grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In determining whether a genuine issue of material fact exists, . . . the evidence [must be viewed] in the light most favorable to the nonmoving party.  However, a nonmovant cannot defeat summary judgment with merely a scintilla of evidence." American Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009) (citation omitted).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).  The party seeking summary judgment has the initial burden to show "an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Additionally, even for unopposed summary judgment motions, the moving party must establish "that it is entitled to a judgment as a matter of law."  Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993) (internal quotation marks omitted).

-15-

In this case, Plaintiff failed to respond to the Summary Judgment Motion (<u>see</u> Docket Entries dated Feb. 15, 2016, to present), despite notice to do so (<u>see</u> Docket Entry 59). However, Plaintiff's "verified [Amended C]omplaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991) (emphasis omitted). The undersigned United States Magistrate Judge will therefore consider the verified allegations in the Amended Complaint in resolving the Summary Judgment Motion.[4]

Pursuant to 42 U.S.C. § 1983, Plaintiff alleges that Defendants violated his constitutional rights through the use of excessive force. (<u>See</u> Docket Entry 28 at 2-3.) "Section 1983 of Title 42 creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." <u>Cooper v. Sheehan</u>, 735 F.3d 153, 158 (4th Cir. 2013). Defendants seek summary judgment on the grounds that (1) the applicable statute of limitations bars

---

[4] Although Plaintiff verified the Amended Complaint (<u>see</u> Docket Entry 28 at 5), he did not verify the Complaint (<u>see</u> Docket Entry 2). The undersigned United States Magistrate Judge will therefore not consider the allegations in the Complaint in resolving the Summary Judgment Motion. <u>See</u> <u>Aloisi v. Morgan</u>, No. 86-6717, 804 F.2d 1250 (table), 1986 WL 18016, at *1 (4th Cir. Nov. 11, 1986) (unpublished) (recognizing that "if [the plaintiff] had filed a verified complaint, he could . . . rely on his pleading in resisting a motion for summary judgment").

Plaintiff's excessive force claim against the Search Defendants, and (2) qualified immunity protects Defendants from suit in this action.

## B. The Statute of Limitations Defense

The Search Defendants contend that the events underlying Plaintiff's excessive force claim against them occurred on September 7, 2011, and that the applicable statute of limitations bars that claim. (Docket Entry 53, ¶¶ 6, 53; Docket Entry 54, ¶ 4; Docket Entry 55, ¶ 5; see also Docket Entry 52 at 5-9.) In contrast, the Amended Complaint asserts that the events giving rise to Plaintiff's excessive force claim all occurred on September 8, 2011, rather than on September 7, 2011. (Docket Entry 28 at 2; see also id. at 1 (alleging that "[t]he correct date for the excessive force claim is actually on 9-8-11").) Under either date, however, the applicable statute of limitations does not bar Plaintiff's excessive force claim against the Search Defendants.

"There is no federal statute of limitations for [Section] 1983 claims, so the state limitations period which governs personal injury actions is applied." Lewis v. Richmond City Police Dep't, 947 F.2d 733, 735 (4th Cir. 1991) (per curiam). North Carolina has a three-year statute of limitations for personal injury claims. N.C. Gen. Stat. § 1-52. "[T]he Federal Rules of Civil Procedure [(the "Rules")] govern the commencement of . . . suit[s] [involving

federal question jurisdiction] for purposes of tolling the state statute of limitations." <u>Lewis</u>, 947 F.2d at 735. Under the Rules, "[a] civil action is commenced by filing a complaint with the court." Fed. R. Civ. P. 3. Of particular importance here, Rule 6(a) provides that, when computing a time period "stated in days or a longer unit of time[,] . . . include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday." Fed. R. Civ. P. 6(a)(1)(C). Applying these Rules, "[a]s long as the complaint is deemed filed within the limitations period, the action is timely." <u>Lewis</u>, 947 F.2d at 735.

Here, even assuming that the events giving rise to Plaintiff's excessive force claim against the Search Defendants occurred on September 7, 2011, the relevant three-year statute of limitations period would not bar this action.[5] September 7, 2014, the last day of the limitations period, fell on a Sunday. Under Rules 3 and 6(a), Plaintiff therefore had until Monday, September 8, 2014, to

---

[5] Plaintiff does not dispute that he became aware of his excessive force claim against the Search Defendants, and it therefore "accrued" for statute of limitations purposes, on the date that the Search Defendants allegedly used excessive force against him. <u>See</u> <u>Nasim v. Warden, Md. House of Corr.</u>, 64 F.3d 951, 955 (4th Cir. 1995) (en banc) (explaining that a plaintiff's Section 1983 claim accrues, and the statute of limitations runs, from the date on which he "possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action").

-18-

file the Complaint.  See Lewis, 947 F.2d at 734-35, 735 n.1 (concluding that, because the last day of the limitations period ended on a Saturday, under Rules 3 and 6(a), the plaintiff had until the following Monday to file his Section 1983 excessive force claim); see also Sain v. City of Bend, 309 F.3d 1134, 1138 (9th Cir. 2002) (holding that, "Rules 3 and 6(a), taken together, dictate that a Sunday not be counted in a [Section] 1983 action when that Sunday is the last day in the [limitations] period"). The Complaint shows a filing date of September 8, 2014.  (Docket Entry 2 at 1.)  The applicable three-year statute of limitations therefore does not bar Plaintiff's excessive force claim against the Search Defendants.

Moreover, even without a Rule 6(a) extension, the Complaint would remain timely.  The envelope containing the Complaint states, "Mailed From Tabor Correctional Inst[itute]."  (Docket Entry 2-1 at 1.)  Plaintiff thus initiated this action while incarcerated.

For an incarcerated plaintiff proceeding pro se, an action is deemed filed "when the [plaintiff] delivers his pleading to prison authorities for forwarding to the court clerk."  Lewis, 947 F.2d at 735.  Numerous reasons exist for this "bright line rule":

> [Pro se prisoners] are unable to monitor the process of the mails as are other litigants.  They are unaware of delays and unable to rectify any problems even if they were apprised of them.  They cannot deliver a copy of their document to the clerk by hand, and do not have access to express mail services.  They must rely on correctional authorities, who may be motivated to delay

-19-

the filing. If the pleading is delayed, they have no way
to determine the cause and possibly obtain evidence to
support a finding of excusable neglect. Because they are
acting pro se, they do not have an attorney who can
monitor the process for them. Furthermore, correctional
facilities maintain records of outgoing prisoner mail,
thereby minimizing disputes and uncertainties regarding
the moment of filing.

Id. at 735-36.

Due to Plaintiff's incarceration, he "commenced" this action,
for statute of limitations purposes, when he delivered the
Complaint to prison officials for mailing, rather than when the
Clerk filed the Complaint in this Court. See id. The record
establishes that the Clerk stamped the Complaint as received at
1:20 p.m. on Monday, September 8, 2014. (Docket Entry 2-1 at 1.)
In order for the Clerk to have received the Complaint on September
8, 2014, Plaintiff must have delivered the Complaint to prison
officials for mailing prior to that day. Thus, Plaintiff timely
commenced this action by delivering the Complaint to prison
officials for mailing before September 8, 2014. See Lewis, 947
F.2d at 735-36.

## C. The Qualified Immunity Defense

Defendants further contend that, pursuant to applicable law,
they enjoy qualified immunity from Plaintiff's excessive force
claim. (Docket Entry 51 at 2.) The Amended Complaint details four
incidents of alleged excessive force, all of which occurred
sometime after Plaintiff's arrest. (See Docket Entry 28 at 2-3

-20-

(alleging that Defendants used excessive force against Plaintiff
after "Plaintiff was apprehended, handcuffed and arrested").) "The
doctrine of qualified immunity protects government officials 'from
liability for civil damages insofar as their conduct does not
violate clearly established statutory or constitutional rights of
which a reasonable person would have known.'" Pearson v. Callahan,
555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S.
800, 818 (1982)). "Qualified immunity is 'an entitlement not to
stand trial or face the other burdens of litigation.'" Brown v.
Gilmore, 278 F.3d 362, 366-67 (4th Cir. 2002) (quoting Mitchell v.
Forsyth, 472 U.S. 511, 526 (1985)). "The Supreme Court has
directed that 'qualified immunity questions should be resolved at
the earliest possible stage of a litigation.'" Smith v. Reddy, 101
F.3d 351, 357 (4th Cir. 1996) (quoting Anderson v. Creighton, 483
U.S. 635, 646 n.6 (1987)).

In analyzing qualified immunity, the Court must consider
(1) "whether a constitutional violation occurred," and (2) "whether
the right violated was 'clearly established' at the time of the
official's conduct." Williams v. Ozmint, 716 F.3d 801, 805 (4th
Cir. 2013). The Court possesses discretion to address either
prong first. Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011)
(en banc).[6]

---

[6] Defendants only address the first prong of the qualified
immunity analysis. (See Docket Entry 52 at 9-14.) Accordingly,

Plaintiff cites the "Eight[h] Amendment/Cruel and Unusual Punishment" as the predicate for his excessive force claim (Docket Entry 28 at 2), but the Eighth Amendment does not apply until after conviction and sentence, Lee v. O'Malley, 533 F. Supp. 2d 548, 552 n.5 (D. Md. 2007).[7] Plaintiff's criminal case clearly had not reached the point of a formal adjudication of guilt at the time of the events giving rise to his excessive force claim.

Even though the Eighth Amendment's cruel and unusual punishment prohibition does not apply to arrestees / pretrial detainees such as Plaintiff, the Due Process clause of the Fourteenth Amendment protects them from an officer's use of excessive force. See Kingsley v. Hendrickson, ___ U.S. ___, ___, 135 S. Ct. 2466, 2475 (2015). In Kingsley, the Supreme Court observed that "pretrial detainees (unlike convicted prisoners) cannot be punished at all." Id. at ___, 135 S. Ct. at 2475. Accordingly, a pretrial detainee can "prevail [on an excessive force claim] by showing that the [defendant's] actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" Id. at ___, 135 S. Ct. at 2473 (quoting Bell v.

_____

this recommendation will focus on whether Defendants committed a constitutional violation of Plaintiff's rights.

[7] The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

<u>Wolfish</u>, 441 U.S. 520, 561 (1979)).  Ultimately, a standard of objective reasonableness applies to a pretrial detainee's excessive force claim.  <u>Id.</u> at ___, 135 S. Ct. at 2472-73.

The Supreme Court has provided several factors to analyze "the reasonableness or unreasonableness" of the alleged forced used:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

<u>Id.</u> at ___, 135 S. Ct. at 2473 (citing <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)).  Although not exclusive, these factors "illustrate the types of objective circumstances potentially relevant to a determination of excessive force."  <u>Id.</u>

In addition, the determination of whether an officer used excessive force must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."  <u>Id.</u>  In the jail setting, "court[s] must also account for the 'legitimate interests that stem from the government's need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in the judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'"  <u>Id.</u> (brackets omitted) (quoting <u>Bell</u>, 441 U.S. at 540, 547).

-23-

### i. The "Search" Incident

Plaintiff first alleges excessive force by the Search Defendants prior to his transport to the jail. In that regard, the record establishes that Plaintiff and Ms. Haizlip attempted to elude officers in a vehicle chase. (Docket Entry 53, ¶¶ 12-15; Docket Entry 54, ¶¶ 5-7).) After the vehicle chase ended, Plaintiff exited the SUV and led officers on a foot chase. (Docket Entry 53, ¶¶ 15-23.) During the foot chase, Plaintiff briefly stopped (id. ¶¶ 20-21) and "bur[ied] something in a bush filled area" (Docket Entry 55, ¶ 9), where officers later recovered narcotics buried loosely in the dirt (Docket Entry 53, ¶ 28). While pursuing Plaintiff on foot, Defendant Moore issued commands to Plaintiff and ordered him to stop fleeing numerous times. (Id. ¶¶ 16, 18, 20, 22-23.) However, Plaintiff ignored Defendant Moore's commands and kept running. (Id. ¶¶ 17, 19-22.) When Defendant Moore finally caught Plaintiff, he "tackled [Plaintiff] to the ground" and "then placed handcuffs on [Plaintiff] and told him he was under arrest." (Id. ¶ 22.)

After Plaintiff's apprehension and arrest, officers searched Plaintiff before transporting him to jail. (Docket Entry 28 at 2; see also Docket Entry 54, ¶ 13; Docket Entry 55, ¶¶ 17-18, 20.) At the time officers initiated the search, "Plaintiff was . . . seated on [a] curb." (Docket Entry 54, ¶ 12; see also Docket Entry 28 at 2.) "Officers lifted the Plaintiff off the curb to search him,"

-24-

but "Plaintiff became visibly agitated" and "mouth[ed] off to the officers" during the search. (Docket Entry 54, ¶ 13.) Officers "told [Plaintiff] to sit back down after he was searched." (Docket Entry 28 at 2.) Plaintiff "stiffen[ed] his body and [took] steps backward to avoid sitting." (Docket Entry 54, ¶ 14.) "Due to Plaintiff's resisting, . . . officers [had] difficulty getting [him] to sit down." (Id. ¶ 15.)

At this point, the parties' versions of the events differ. The Amended Complaint asserts that, as Plaintiff attempted to sit down, "[Defendant] Caviness kicked [him] in the right side of his leg," while at "the same time [Defendant] Hannon and [Defendant] Moore pull[ed] and drag[ged] the [P]laintiff to and on the ground (concrete)." (Docket Entry 28 at 2-3.) The Amended Complaint further asserts that the force applied caused abrasions to Plaintiff's elbows and left forearm. (Id. at 3.)

In contrast, Defendant Moore reports that he "did not use physical force against [Plaintiff] with the exception of taking [Plaintiff] to the ground and forcibly handcuffing him" (Docket Entry 53, ¶ 26), that he "did not observe any force applied by . . . [Defendant] Caviness" (id.), and that he did not "observe any signs of injury" to Plaintiff (id. ¶ 55). Further, Defendant Caviness reports that she "simply placed [her] foot out[, and] . . . did not kick [Plaintiff] or attempt to kick him in any[ ]way" (Docket Entry 54, ¶ 15), that she "stuck [her] foot out to prevent

-25-

[Plaintiff] from stiffening his body and [to] allow the officers to lower [Plaintiff] to the ground" (id.), that she "did not see any officers drag the Plaintiff on the ground" (id. ¶ 19), and that she does "not recall the Plaintiff having any bruises or bleeding in anyway" (id. ¶ 18).  In addition, Defendant Hannon reports that he did not "drag the Plaintiff across any ground" (Docket Entry 55, ¶ 14), that "[he] assisted the Plaintiff off of the curb by picking [Plaintiff] up by one arm so that he would go from sitting to standing" (id. ¶ 17), and that he "searched the Plaintiff per normal procedure" (id. ¶ 18).

At this stage of the proceedings, the question becomes whether the record - when viewed in the light most favorable to Plaintiff - i.e., assuming that Defendant Caviness kicked the right side of Plaintiff's leg, while Defendant Moore and Defendant Hannon pulled and dragged Plaintiff to and on the ground, qualifies as objectively unreasonable under the circumstances.  See Kingsley, ___ U.S. at ___, 135 S. Ct. at 2473 (holding that "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable," and that "objective reasonableness turns on the 'facts and circumstances of each particular case'" (quoting Graham, 490 U.S. at 396)); see also Grisson v. City of Fayetteville, No. 5:14-CV-272, 2015 WL 5797661, at *4 (E.D.N.C. Oct. 2, 2015) (unpublished) (noting that "it is appropriate to determine whether the force used was objectively

-26-

reasonable in full context, as a segmented view of the events 'misses the forest for the trees'" (quoting <u>Smith v. Ray</u>, 781 F.3d 95, 101 (4th Cir. 2015))).

The first <u>Kingsley</u> factor (the relationship between the need for the use of force and the amount of force used) weighs heavily in favor of the Search Defendants. Defendant Caviness reported that "[i]t was crucial for the Plaintiff to remain seated due to his history of flight, and the fact that being handcuffed would not hinder his ability to engage in another foot pursuit." (Docket Entry 54, ¶ 14.) Moreover, although Plaintiff reported attempting to sit down at the same time the Search Defendants used force to compel him to sit, the Amended Complaint does not dispute that, before Plaintiff's attempt to sit down, he actively resisted the officers' efforts to put him on the ground. (<u>See</u> Docket Entry 28; <u>see also</u> Docket Entry 54, ¶ 14 (asserting that, "[w]hile officers were attempting to sit the Plaintiff back down, Plaintiff would stiffen his body and take steps backward to avoid sitting"); <u>id.</u> ¶ 16 (asserting that, during the entire search encounter, "Plaintiff was uncooperative, belligerent, angry, and consistently physically resisting").)

Importantly, Plaintiff has provided no evidence to suggest that, before the Search Defendants applied force to put him on the ground, he had made them aware that he would comply with the officers' orders to sit. "The law cannot demand that officers be

-27-

mind readers," Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) (explaining that the officers could not be charged with knowing of the plaintiff's medical history because the plaintiff had not informed them of such), and nothing in the record here suggests that the Search Defendants should have known that Plaintiff intended to comply with their attempts to put him on the ground at the time they applied force, see Kingsley, ___ U.S. at ___, 135 S. Ct. at 2473 (applying Graham Fourth Amendment reasonableness standard for analyzing claim of excessive force under the Fourteenth Amendment's Due Process Clause); Graham, 490 U.S. at 396 (explaining that, "[w]ith respect to a claim for excessive force, the same standard of reasonableness at the moment applies" (emphasis added)). In other words, Plaintiff's recent flight, coupled with his physical resistance, provided an objectively reasonable need for the Search Defendants to use force to put Plaintiff back on the ground, notwithstanding Plaintiff's contention that he attempted to sit down at the same time that officers applied force. See Graham v. Gagnon, ___ F.3d ___, ___, 2016 WL 4011156, at *4 n.1 (4th Cir. 2016) (recognizing that "[q]ualified immunity does not shield officials from liability for all of their mistakes, but it does shield them when their mistakes were reasonable"); Mills v. Rich, No. 7:13-CV-138, 2015 WL 5139198, at *5 (E.D.N.C. Sept. 1, 2015) (unpublished) (concluding that a "closed-fist punch to [the plaintiff's] head and rough takedown may

-28-

indeed have been more than what was necessary when considering the circumstances in hindsight," but that, "[u]nder the[] circumstances, and having considered the officers' actions in context and from the perspective of a reasonable officer on the scene, . . . [the officers] made at worst mistaken but reasonable judgments").

Furthermore, the amount of force that the Search Defendants used remained proportional to the need to place Plaintiff on the ground. In that regard, Plaintiff reports that Defendant Caviness kicked him in the leg, and that Defendant Moore and Defendant Hannon dragged and pulled him to and on the ground. (Docket Entry 28 at 2-3.) Defendant Caviness made contact with Plaintiff's leg "to prevent him from stiffening his body and [to] allow the officers to lower him to the ground." (Docket Entry 54, ¶ 15.) Kicking Plaintiff in the leg, while Defendant Moore and Defendant Hannon pulled and dragged Plaintiff to and on the ground amounts to a reasonable application of force to ensure Plaintiff resumed sitting to lessen his risk of flight. See <u>Skinner v. Sproul</u>, No. 1:14-CV-174, 2016 WL 796015, at *11-13 (M.D. Ga. Feb. 26, 2016) (unpublished) (recommending that summary judgment be entered in favor of the defendants on the plaintiff's excessive force claim where the defendants twice took the plaintiff to the floor, carried him into the hallway, and forcibly handcuffed him, because the undisputed evidence revealed that the plaintiff physically resisted

-29-

the defendants and did not cooperate with their orders, thereby
necessitating the use of that physical force to gain the
plaintiff's compliance), recommendation adopted in relevant part,
slip op. (M.D. Ga. Mar. 28, 2016). Plaintiff suffered no major
injuries from the Search Defendants' application of force, and he
does not allege that the Search Defendants continued using force
after putting him on the ground. (See Docket Entry 28.) Under
these circumstances, "the relationship between the need for force
and the amount of force used to restore discipline was closely
matched." See Ellenburg v. Henderson Cty. Jail, 1:14-CV-290, 2016
WL 1354980, at *4 (W.D.N.C. Apr. 5, 2016) (unpublished) (finding
that the force applied remained proportional to its need where the
defendant only used force after the plaintiff refused an order to
stop fighting, the force ended when its need subsided, and "no
other means of force such as pepper spray, batons, or fists were
used").

        The second Kingsley factor (the extent of the plaintiff's
injury) also weighs in favor of the Search Defendants. The Amended
Complaint alleges that Plaintiff suffered "abrasions" to his elbows
and left forearm from the Search Defendants' actions. (See Docket
Entry 28 at 2-3.) Notably, the Amended Complaint does not allege
that the abrasions required medical treatment. (See Docket Entry

28 at 2-3.)[8]  This relatively minor injury, combined with the lack
of injury to Plaintiff's leg or any other body part, indicates that
the Search Defendants did not apply a significant amount of force
when putting Plaintiff back on the ground.  See Wilkins v. Gaddy,
559 U.S. 34, 37 (2010) (discussing excessive force analysis under
the Eighth Amendment and explaining that, "[t]he extent of injury
suffered . . . may suggest whether the use of force could plausibly
have been thought necessary in a particular situation" and "may
also provide some indication of the amount of force applied"
(internal brackets and quotation marks omitted)); see also
Ellenburg, 2016 WL 1354980, at *4 (finding the extent of the
plaintiff's injury "minimal" even where the defendant shot the
plaintiff with a taser that caused a cut in the plaintiff's side).

    The third Kingsley factor (any effort made by the officer to
temper or limit the amount of force) also weighs in favor of the
Search Defendants.  Defendant Caviness reports that Plaintiff
physically resisted the officers' attempts to sit him on the
ground.  (Docket Entry 54, ¶¶ 14-16.)  Only after Plaintiff
resisted those attempts, did the Search Defendants use the
necessary force to compel Plaintiff to sit.  (See id. ¶ 15.)  The
record thus establishes that the Search Defendants attempted to

_____

    [8] Plaintiff refused Medic Cross's offer to provide him medical
attention on the scene (Docket Entry 57, ¶¶ 7-9), but the record
does not reveal whether that refusal occurred before or after the
Search Defendants' application of force.

gain Plaintiff's compliance before applying the necessary force to lower him into a seated position, and that, once the Search Defendants' gained Plaintiff's compliance, they stopped using force. See Ellenburg, 2016 WL 1354980, at *4 (finding that the third Kingsley factor favored the defendant where he ordered the plaintiff to stop fighting before employing force).

The fourth Kingsley factor (the severity of the security problem at issue) also weighs in favor of the Search Defendants. The record establishes that Plaintiff put the safety of the public and officers at serious risk by participating in a vehicle chase and running from officers on foot, all while ignoring officers' repeated commands to stop. (Docket Entry 53, ¶¶ 6-23; Docket Entry 54, ¶¶ 5-8; Docket Entry 55, ¶¶ 5-11.) Further, Defendant Moore suffered abrasion injuries as a result of the foot chase (Docket Entry 53, ¶ 24), and Plaintiff continued resisting officers even after his apprehension and arrest (id. ¶ 23; see also Docket Entry 54, ¶¶ 11, 13-16). Additionally, Plaintiff's feet remained unbound during the search incident, heightening his risk of flight. See Graham, 490 U.S. at 396 (observing that the plaintiff's "attempt[s] to evade arrest by flight" factors into the reasonableness of an officer's use of force in detaining a suspect). Under these circumstances, Plaintiff presented a serious flight risk, and any further flight would present further risk of injury to Plaintiff, the officers, and the public. See Mills, 2015 WL 5139198, at *5

(ruling that the "[e]scape of a detainee would be a serious security issue" (citing McKenney v. Harrison, 635 F.3d 354, 360 (8th Cir. 2011) (concluding that officers could use force to prevent arrestee's escape))).

The fifth Kingsley factor (the threat reasonably perceived by the officer), also favors the Search Defendants. Plaintiff's previous attempts to elude the officers increased the possibility that he would flee again if officers allowed him to remain standing. As discussed above, Defendant Caviness conveys the officers' legitimate concerns that "[i]t was crucial for . . . Plaintiff to remain seated due to his history of flight, and the fact that being handcuffed would not hinder his ability to engage in another foot pursuit." (Docket Entry 55, ¶ 14.) If Plaintiff escaped, officers would again need to pursue Plaintiff, increasing the possibility of further injury. Given Plaintiff's proven tendency to flee from officers, an objectively reasonable threat existed that Plaintiff's risk of flight increased if Plaintiff remained standing.

The sixth Kingsley factor (whether the plaintiff actively resisted) also favors the Search Defendants. Plaintiff does not dispute that he actively resisted the Search Defendants' attempts to sit him on the ground. (See Docket Entry 28; see also Docket Entry 54, ¶¶ 14, 16 (detailing Plaintiff's resistance).) As discussed above, given Plaintiff's noncompliance, the Search

-33-

Defendants lacked any reasonable basis to foresee that Plaintiff would attempt to sit down at the same time that they applied force. See generally Graham, 490 U.S. at 396 (recognizing that "not every push or shove, even if it may later seem unnecessary" amounts to a deprivation of a constitutional right).

In sum, all six Kingsley factors favor the Search Defendants. The record evidence thus establishes that the amount of force the Search Defendants' applied to put Plaintiff on the ground did not qualify as objectively unreasonable under the circumstances. The Court should therefore award summary judgment in favor of the Search Defendants.

### ii. The "Jail" Incidents

Plaintiff's remaining allegations of excessive force involve only Defendant Alston and concern events at the jail. There, the record establishes that, after Plaintiff and Ms. Haizlip arrived at the jail, they "became aggravated" (Docket Entry 56, ¶ 20) and "visibly angry towards [Defendant] Moore and [Defendant Alston]" (id. ¶ 21; see also Docket Entry 53, ¶¶ 41-46). While Plaintiff remained free of handcuffs (Docket Entry 56, ¶ 22), he used an "aggressive tone" towards Defendant Alston (id. ¶ 23), and approached Defendant Alston "in a fighting manner" (id. ¶ 24). "Ultimately, the Plaintiff squared his body to [Defendant Alston] and took an aggressive, fighting stance." (Id. ¶ 25.) "These were

-34-

all signs of a pre-assault, meaning a person is either going to run or assault." (Docket Entry 53, ¶ 43.)

"[Defendant Alston] attempted to escort [Plaintiff] back to the bench where he had been sitting, but [Plaintiff] went back into the corner, remained in an aggressive stance, and was clenching his fists." (Docket Entry 56, ¶ 26.) "The Plaintiff also proceeded to call [Defendant Alston] multiple racist names." (Id. ¶ 27.) "Ms. Haizlip then attempted to get involved, but [Defendant] Moore took physical control of her and ensured that she remained on the bench." (Id. ¶ 28.) "[Defendant Alston] continued to try and gain control of the Plaintiff and the Plaintiff continued to take a stance as if [he] wanted to physically fight." (Id. ¶ 29.) "During this time, while Ms. Haizlip was handcuffed, she was still attempting to get involved." (Id. ¶ 30.)

At this point, the parties' versions of events come into conflict. The Amended Complaint asserts that "[Defendant] Alston grab[bed] the Plaintiff and t[ook] him to the concrete floor roughly and handcuff[ed] him behind his back." (Docket Entry 28 at 3.) In contrast, Defendant Alston asserts that he "was able to bring the Plaintiff to the ground in normal fashion and place him in handcuffs" (Docket Entry 56, ¶ 31), and Defendant Moore reports that "[Defendant] Alston proceeded to take the Plaintiff to the ground as standard procedure dictates" (Docket Entry 53, ¶ 45).

The Amended Complaint further asserts that Defendant Alston "attemps [sic] to pick up the Plaintiff by the handcuffs," and "[a]t this point[, Defendant] Alston drops the Plaintiff back to the concrete floor." (Docket Entry 28 at 3.) Conversely, neither Defendant Alston nor Defendant Moore acknowledge (in their declarations) that Defendant Alston dropped Plaintiff after handcuffing him on the floor. (See Docket Entries 53, 56.)

Uncontested evidence in the record establishes that Defendant Moore assisted Defendant Alston with picking up Plaintiff from the floor, and opened the holding cell door. (Docket Entry 28 at 3.) Defendant Alston "took [Plaintiff] over to the [holding] cell to place him in it." (Docket Entry 56, ¶ 32.) Because "Plaintiff continued to physically resist being moved," Defendant Alston "grapple[d] [with] the Plaintiff face-to-face." (Id. ¶ 34.)

Here, again, the parties' versions of events diverge. The Amended Complaint asserts that Defendant Alston grabbed Plaintiff and "thr[ew] him into the holding cell roughly with the handcuffs still on, into the wall further injuring [Plaintiff's] already wrap [sic] arms [from] the abrasion injuries." (Docket Entry 28 at 3.) In contrast, Defendant Alston reports that he "put [Plaintiff] into the holding cell," and that "[a]t no point did [he] propel the Plaintiff with force which caused the Plaintiff to fall, hit a wall or come into contact with any other objects." (Docket Entry 56, ¶ 34.) Defendant Moore reports that Defendant Alston "pushed the

-36-

Plaintiff into the cell" (Docket Entry 53, ¶ 50), and that, "[w]hen the Plaintiff was pushed into the cell, [Plaintiff] never came in contact with any fixed objects, nor did he fall to the ground" (id. ¶ 51).

After Plaintiff entered the cell, uncontested evidence establishes that "[Defendant] Moore quickly closed the door to prevent the Plaintiff from attempting to charge back out." (Docket Entry 56, ¶ 35.) "Nevertheless, the Plaintiff immediately [spat] in [Defendant Alston's] direction close to [him]." (Id. ¶ 36.)[9] At no point did Plaintiff make a "request for EMS or medical attention." (Id. ¶ 37.)

Under these circumstances, the Court must determine whether the record - when viewed in the light most favorable to Plaintiff - would permit the conclusion that Defendant Alston used excessive force by (1) taking Plaintiff "roughly" to the ground and handcuffing him, (2) dropping Plaintiff to the ground after picking him up by his handcuffs, and/or (3) throwing Plaintiff "roughly" into the holding cell such that Plaintiff hit a wall.

### a. The Handcuff Incident

The first application of force at the jail (accepting Plaintiff's account) involved Defendant Alston grabbing Plaintiff,

---

[9] Defendant Moore reports that Plaintiff's spit actually contacted Defendant Alston. (Docket Entry 53, ¶ 51 ("The Plaintiff spat on [Defendant] Alston and then I closed the door.").)

-37-

taking him to the concrete floor "roughly," and handcuffing him behind his back. (Docket Entry 28 at 3.) With respect to that use of force, the first Kingsley factor (the relationship between the need for the use of force and the amount of force used) favors Defendant Alston. The undisputed record reveals that, while unhandcuffed, Plaintiff engaged in verbally and physically threatening conduct towards Defendant Alston, backed himself into a corner, and readied himself for a fight. (Docket Entry 56, ¶¶ 23-27, 29.) Furthermore, Ms. Haizlip twice attempted to involve herself in the altercation between Defendant Alston and Plaintiff (Id. ¶¶ 28, 30), increasing the security and safety threat to others in the jail. Defendant Alston did not use a weapon or strike Plaintiff to gain control of the situation. (See Docket Entry 28 at 3.) On this record, even when viewed in the light most favorable to Plaintiff, the unrestrained, physically threatening conduct of Plaintiff obliged Defendant Alston to use force to gain control of the situation, and the force Defendant Alston applied remained proportional to its need. See Sims v. King Cty. Corr. Facility, Civ. Action No. C15-662, 2016 WL 384828, at *4 (W.D. Wash. Jan. 7, 2016) (unpublished) (recommending entry of summary judgment in favor of the defendants on the plaintiff's excessive force claim, and observing that, where the plaintiff refused to be cuffed, the defendants' use of leg, arm, and wrist locks remained a reasonable use of force to compel compliance), recommendation

-38-

adopted, slip op. (W.D. Wash. Feb. 1, 2016); Edmonds v. Boswell, 3:14CV30, 2015 WL 6674188, at *4-5 (E.D. Va. Oct. 30, 2015) (unpublished) (concluding that an officer's hand strike to push a detainee away did not amount to excessive force where the detainee "had been unruly and was . . . unrestrained," which presented a "moderate security threat" to the officer, and that the officers' use of a taser remained reasonable where the detainee "actively resisted any effort by the officers to restrain him," and instead, "physically attacked" an officer).

Likewise, the second Kingsley factor (the extent of the plaintiff's injury) favors Defendant Alston, as Plaintiff does not allege that he suffered any specific injury from the force Defendant Alston used in taking him roughly to the ground and handcuffing his arms behind his back. See generally Landy v. Isenberg, Civ. Action No. PWG-14-501, 2015 WL 5289027, at *4 (D. Md. Sept. 9, 2015) (unpublished) (concluding that the plaintiff's injuries of "minor bruising to the wrists and a scrape to his knee" demonstrated that officers applied minimum force to secure and restrain him). The third Kingsley factor (any effort made by the officer to temper or to limit the amount of force) also favors Defendant Alston, as the uncontested evidence reflects that, before Defendant Alston took Plaintiff roughly to the ground, he first "attempted to escort [Plaintiff] back to the bench where he had been sitting." (Docket Entry 56, ¶ 26.) However, "[Plaintiff]

-39-

went back into the corner, remained in an aggressive stance, and
. . . clench[ed] his fists." (Id.) "[Defendant Alston] continued
to try and gain control of the Plaintiff," but Plaintiff remained
aggressive. (Id. ¶ 29.) In other words, Defendant Alston made
attempts to gain control of Plaintiff before applying force.

The fourth and fifth Kingsley factors (the severity of the
security problem at issue, and the threat reasonably perceived by
the officer) further favor Defendant Alston, as Plaintiff's
unrestrained, combative behavior presented an objectively severe
security threat and danger to the safety of Defendant Alston and
others. In that regard, Plaintiff called Defendant Alston
"derogatory names," "clench[ed] his fists," and faced Defendant
Alston "in an aggressive fighting stance" (Docket Entry 53, ¶ 42),
"all signs of a pre-assault, meaning a person is either going to
run or assault" (id. ¶ 43). "[A] physical altercation between a
police officer and detainee is indicative of a . . . security and
safety issue." Mills, 2015 WL 5139198, at *4; see also Skinner,
2016 WL 796015, at *13 (observing that "the [d]efendants reasonably
perceived a threat given [the p]laintiff's continuous refusal to
comply"). Additionally, Ms. Haizlip attempted to interfere in the
altercation between Defendant Alston and Plaintiff (Docket Entry
53, ¶ 46), further increasing the safety and security threat to
Defendant Alston and Defendant Moore.

Lastly, the sixth <u>Kingsley</u> factor (whether the plaintiff actively resisted) also favors Defendant Alston. In short, the undisputed evidence establishes that Plaintiff actively resisted Defendant Alston's attempts to escort him back to the bench by backing himself into a corner and attempting to engage Defendant Alston in a physical altercation. (Docket Entry 56, ¶¶ 25-27, 29.)

On balance, each of the six <u>Kingsley</u> factors favors Defendant Alston and leads to the conclusion that Defendant Alston's application of force in grabbing Plaintiff, taking "him to the concrete floor roughly[,] and handcuff[ing] him behind his back" (Docket Entry 28 at 3) does not qualify as objectively unreasonable under the circumstances. <u>See, e.g.</u>, <u>Skinner</u>, 2016 WL 796015, at *13 (concluding that twice taking the plaintiff to the floor and forcing him to wear handcuffs did not amount to excessive force where the plaintiff did not comply with the defendants' requests that he "be handcuffed and walk back to his cell"). Plaintiff has therefore not shown that this particular application of force amounted to <u>excessive</u> force in violation of his constitutional rights.

### b. The Dropping Incident

Defendant Alston's second application of force identified by Plaintiff involved Defendant Alston dropping Plaintiff to the concrete floor while picking Plaintiff up by the handcuffs. (<u>See</u> Docket Entry 28 at 3.) Specifically, Plaintiff has averred that

-41-

Defendant Alston dropped Plaintiff "in attemps [sic] to further injure him." (Id.) Again, Defendant Alston neither disputes nor acknowledges dropping Plaintiff. (See Docket Entry 56.)

Although "the [excessive force] standard is an objective one, [and] the Court is not concerned with the officers' motivation" in applying force, Grisson, 2015 WL 5797661, at *4 (discussing excessive force standard under the Fourth Amendment); see also Kingsley, ___ U.S. at ___, 135 S. Ct. at 2475 (holding that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one"), the allegation that Defendant Alston dropped Plaintiff with intent to injure him - viewed in the light most favorable to Plaintiff - establishes that the drop did not result from Defendant Alston's negligence, see Kingsley, ___ U.S. at ___, 135 S. Ct. at 2472 (concluding that "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind" for the plaintiff to succeed on an excessive force claim because "'liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process'" (emphasis in original) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998))); see also Daniels v. Williams, 474 U.S. 327, 331 (1986) (observing that, "[h]istorically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property" (emphasis in original)).

-42-

Against this backdrop, the first Kingsley factor (the relationship between the need for the use of force and the amount of force used) weighs in favor of Plaintiff. The record reveals that, when Defendant Alston dropped Plaintiff to the ground, he had already forced Plaintiff face down on the ground and handcuffed him behind his back. (Docket Entry 28 at 3.) Therefore, at the time of the drop, no need existed to apply force (i.e., dropping Plaintiff). See generally Kingsley, ___ U.S. at ___, 135 S. Ct. at 2473 (recognizing that "'the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment'" (quoting Graham, 490 U.S. at 395 n.10)).

The second Kingsley factor (the extent of the plaintiff's injury) favors Defendant Alston, as the Amended Complaint does not allege that Plaintiff suffered an injury from the drop. At a minimum, the lack of injury suggests that Defendant Alston did not drop Plaintiff from a particularly severe height. However, the third Kingsley factor (any effort made by the officer to temper or to limit the amount of force) again favors Plaintiff, as the record contains no evidence that Defendant Alston attempted to lessen the amount of force applied in the drop. In fact, Defendants' declarations remain silent as to this particular application of force (i.e., the dropping incident). (See Docket Entries 53-56.)

The fourth and fifth Kingsley factors (the severity of the security problem at issue, and the threat reasonably perceived by

-43-

the officer) also favor Plaintiff.  Here, the record establishes that, at the time of the drop, Defendant Alston had handcuffed Plaintiff's hands behind his back, had placed him face down on the ground, and had begun picking him up, all without further resistance from Plaintiff.  (Docket Entry 28 at 3.)  In that circumstance, a reasonable fact-finder could conclude that Plaintiff no longer presented (and Defendant Alston reasonably could not have perceived Plaintiff as) a security or safety threat.

Likewise, the sixth <u>Kingsley</u> factor (whether the plaintiff actively resisted) also favors Plaintiff.  Simply put, no evidence exists that Plaintiff resisted Defendant Alston's attempts to pick him up from the ground (which could have led to the drop).

In sum, the first, third, fourth, fifth, and sixth <u>Kingsley</u> factors favor Plaintiff and the second favors Defendant Alston, leading to the conclusion that a material question of fact exists as to whether Defendant Alston dropped Plaintiff in a manner that "constitute[d] undue punishment."  <u>Duncan v. Blackwell</u>, 7:14-CV-527, 2015 WL 4067805, at *3 (W.D. Va. Jul. 2, 2015) (unpublished) (concluding that the "[p]laintiff's *pro se*, verified [c]omplaint sufficiently allege[d] that [the d]efendants lacked any objectively reasonable need to [apply the excessive force alleged]").  Put another way, a reasonable fact-finder could conclude that dropping Plaintiff to the ground while he remained handcuffed and compliant qualified as an objectively unreasonable

-44-

use of force under the circumstances.  Accordingly, qualified immunity does not entitle Defendant Alston to judgment as a matter of law as to that particular application of force.[10]

### c. The Throwing Incident

The third and final application of force attributed to Defendant Alston by Plaintiff involved Defendant Alston throwing Plaintiff into the holding cell "roughly" resulting in Plaintiff hitting a wall.  With respect to that incident, the first <u>Kingsley</u> factor (the relationship between the need for the use of force and the amount of force used) favors Defendant Alston.  The uncontested evidence reveals that, despite being taken "roughly" to the concrete floor, placed in handcuffs, and dropped (Docket Entry 28 at 3), Plaintiff "continued to physically resist being moved," forcing Defendant Alston "to grapple the Plaintiff face-to-face" (Docket Entry 56, ¶ 34).  Plaintiff's physical resistance thus necessitated the use of force to place Plaintiff into the holding

---

[10] With regard to the second prong of the qualified immunity analysis (whether the right violated was clearly established at the time of the violation), if the jury credits Plaintiff's version of events, i.e., while Plaintiff remained handcuffed, face-down on the ground, and compliant, Defendant Alston lifted Plaintiff from the floor and purposely dropped him, "then no reasonable officer in [Defendant Alston's] position could have believed that [Defendant Alston's] use of force was lawful." <u>Crowley v. Scott</u>, No. 5:14-CV-326, 2016 WL 2993174, at *7 (M.D. Ga. May 23, 2016) (denying the defendant's motion for summary judgment on qualified immunity grounds where the plaintiff alleged that the defendant used excessive force when he performed "a leg sweep while [the plaintiff] was handcuffed, non-resistant, and otherwise not creating [a] disturbance").

cell.  Further, Defendant Alston did not punch Plaintiff or use a weapon to force Plaintiff into the holding cell.  (See Docket Entry 28 at 3.)  Nor did Defendant Alston continue using force once Plaintiff entered the holding cell.  (See id.)  Instead, according to Plaintiff, Defendant Alston "thr[ew]" Plaintiff "roughly" into the holding cell causing Plaintiff to contact a wall.  (Id.) Plaintiff provides no other details describing the force Defendant Alston used.  (See id.)

Importantly, the Amended Complaint does not describe the force Defendant Alston applied in the throw, or allege that any part of Plaintiff's body contacted the ground.  (See id.)  Accordingly, given Plaintiff's undisputed physical resistance that caused Defendant Alston to grapple with Plaintiff face-to-face to get him in the cell, the physical force Defendant Alston used remained rationally and closely related to the need to counter Plaintiff's resistance and put him into the holding cell.  See Mills, 2015 WL 5139198, at *5 (concluding that a single punch to the plaintiff's face to prevent his escape did not qualify as "objectively disproportionate to the need for force" (citing Schliewe v. Toro, 138 F. App'x 715, 722 (6th Cir. 2005), which, in turn concluded that the officers' actions of punching the plaintiff in the face, twice kicking him in the back, wrestling him to the ground, and dragging him by his feet to a holding cell did not amount to excessive force under the Fourth Amendment, where the record

-46-

revealed that the plaintiff attempted "an escape from the holding area of the police station," "behaved erratically," and "resisted the officers' attempts to subdue him," id. at 718, 722)).

The second <u>Kingsley</u> factor (the extent of the plaintiff's injury) also favors Defendant Alston. Plaintiff reports that his hands remained cuffed behind his back when Defendant Alston threw him into the holding cell, causing him to hit a wall and to suffer further damage to his abrasion injuries (located on his elbows and left forearm). (Docket Entry 28 at 3.) Plaintiff never made a "request for EMS or medical attention" (Docket Entry 56, ¶ 37), indicating that this incident did not significantly exacerbate his abrasion injuries. In short, the absence of any significant injury provides "strong evidence that the force used did not exceed that which was necessary to satisfy th[e] [security] concern." <u>Berry v. Hershberger</u>, Civ. Action No. CCB-14-3145, 2015 WL 4615949, at *7 (D. Md. Jul. 30, 2015) (unpublished) (noting that the plaintiff only suffered a "scratch to his back" from the defendants' alleged use of excessive force).

Similarly, the third <u>Kingsley</u> factor (any effort made by the officer to temper or to limit the amount of force) favors Defendant Alston. The record reflects that Plaintiff physically resisted being moved to the holding cell, "forc[ing] [Defendant Alston] to grapple the Plaintiff face-to-face and put him into the holding cell." (Docket Entry 56, ¶ 34.) Moreover, the Amended Complaint

-47-

does not allege that Defendant Alston threw Plaintiff in the holding cell more than once, or that he continued applying force once Plaintiff entered the cell. Mills, 2015 WL 5139198, at *5 (recognizing that "[t]he short duration of the entire [alleged excessive force] incident, roughly six seconds, demonstrates . . . that an effort was made to limit the amount of force applied").

The fourth Kingsley factor (the severity of the security problem at issue) also favors Defendant Alston. Plaintiff engaged Defendant Alston in a physical altercation, resisted Defendant Alston's attempts to handcuff him, and actively resisted being placed in the holding cell. Such conduct, especially in the confines of a jail, presented a serious security problem. See Edmonds, 2015 WL 6674188, at *4 (noting that an unruly, physically resistant detainee presents a "severe security problem and a threat to the safety of the . . . officers and others in the jail"); see also Whitley v. Albers, 475 U.S. 312, 321 (1986) (observing that prisons present an "'ever-present potential for violent confrontation'" (quoting Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 132 (1977))).

The fifth Kingsley factor (the threat reasonably perceived by the officer) further favors Defendant Alston. Again, Plaintiff had just attempted to engage Defendant Alston in a physical altercation and then resisted Defendant Alston's efforts to put him in the holding cell. Plaintiff's resistance presented an objectively,

-48-

serious threat of escape and/or harm to Defendant Alston, Defendant Moore, and any others in the jail.

Lastly, the sixth <u>Kingsley</u> factor (whether the plaintiff actively resisted) also favors Defendant Alston.  Simply put, the undisputed evidence of record establishes that Plaintiff physically resisted Defendant Alston's attempts to move him into the holding cell.  (Docket Entry 56, ¶ 34.)

All six <u>Kingsley</u> factors thus favor Defendant Alston with regard to the throwing incident.  Applying those factors, the amount of force Defendant Alston used when placing Plaintiff into the holding cell does not qualify as objectively unreasonable under the circumstances.

### IV. CONCLUSION

Defendants have not shown that Plaintiff filed this action untimely.  Regardless, even when viewed in the light most favorable to Plaintiff, the Amended Complaint fails as a matter of law to support his claim against Defendants for excessive force, except as to his claim for excessive force arising out of Defendant Alston picking up and dropping Plaintiff while handcuffed and compliant.

**IT IS THEREFORE RECOMMENDED** that the Summary Judgment Motion (Docket Entry 51) be granted in part and denied in part, in that the Court should enter summary judgment in favor of Defendants on Plaintiff's excessive force claim, except that Plaintiff's claim

-49-

against Defendant Alston for picking up and then dropping Plaintiff while handcuffed and compliant at the jail should survive.

_/s/ L. Patrick Auld_
**L. Patrick Auld**
**United States Magistrate Judge**

August 5, 2016